IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **CESAR MUNOZ**,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>**STATE OF OREGON**; **JACOB ("DALE") MCKINNEY**; **WARREN G. ROBERTS**; **JOSEPH BUGHER**; and **JOHN DOES 1-20**,<br><br>　　　　　Defendants. | Case No. 6:22-cv-1348-SI<br><br>**OPINION AND ORDER** |

Juan C. Chavez and Walter F. Fonseca, OREGON JUSTICE RESOURCE CENTER, PO Box 5248, Portland, OR 97208. Of Attorneys for Plaintiff.

Dan Rayfield, Oregon Attorney General; Nathaniel Aggrey, Robert E. Sullivan, OREGON DEPARTMENT OF JUSTICE, 1162 Court Street NE, Salem, OR 97301. Of Attorneys for Defendants State of Oregon and Jacob McKinney.

Jonathan W. Monson, Nicole A.W. Abercrombie, and Brian S. Epley, CABLE HUSTON LLP, 1455 SW Broadway, Suite 1500, Portland, OR 97201. Of Attorneys for Defendant Joseph Bugher.

Thomas F. Armosino, FROHNMAYER, DEATHERAGE, JAMIESON, MOORE, AROSINO, AND MCGOVERN, PC, 2592 East Barnett Road, Medford, OR 97504. Of Attorneys for Defendant Warren G. Roberts, M.D.

**Michael H. Simon, District Judge.**

　　　　Plaintiff Cesar Munoz is an adult in custody ("AIC") of the Oregon Department of

Corrections ("ODOC"). He has sued the State of Oregon and current or former State employees

PAGE 1 – OPINION AND ORDER

Jacob McKinney, Warren Roberts, M.D., and Joseph Bugher. Munoz alleges violations of his Eighth Amendment rights under 42 U.S.C. § 1983. He further alleges state law claims of battery and medical negligence. Defendant Bugher has moved to dismiss Munoz's § 1983 claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons below, the Court grants Bugher's motion with leave to replead.

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, a court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The Court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The Court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial

PAGE 2 – OPINION AND ORDER

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

## BACKGROUND

On or about September 8, 2020, Munoz and other AICs held at the Oregon State Correctional Institution ("OSCI" or "the Correctional Institution") were evacuated to the Oregon State Penitentiary ("OSP" or "the Penitentiary") because of wildfire concerns. Amended Complaint (ECF 41) ¶ 10. Because many transferees were former gang members, placement in OSP, which Munoz alleges to be "well-known" as "an 'active' gang prison," heightened anxiety among the AICs and "inevitably lead [sic] to protest and acrimony." *Id.* ¶¶ 15-16.

On September 9, 2020, a fight broke out during breakfast time. *Id.* ¶ 18. Munoz did not participate and attempted to leave the dining area. *Id.* ¶¶ 18-19. When he got to the exit, however, Defendant McKinney, a correctional officer at OSP, threatened to mace him. *Id.* ¶ 19. The two began to argue. *Id.*

At the time, Munoz was wearing a medical arm sling because he was still recovering from a shoulder surgery he underwent on August 3, 2020. *Id.* ¶ 17. Munoz states that he was trying to leave the dining area because of his fragile condition. *See id.* ¶ 19.

While Munoz and McKinney were arguing, another member of ODOC staff approached Munoz from behind. *Id.* ¶ 20. Munoz alleges that the staff member restrained and twisted Munoz's post-operative arm and pushed him against the wall. *Id.* When Munoz informed McKinney and a nearby Lieutenant that his arm could not be bent because of the surgery, the

Lieutenant directed McKinney and the other staff to "take [Plaintiff] by that [surgically repaired] arm and shoulder to D.S.U." *Id.* ¶ 21 (alterations in original). McKinney and the other staff "grabbed [Munoz] by his right arm, forced it behind his back, and lifted it upwards, causing his shoulder to crack twice." *Id.* ¶ 22. Munoz felt and heard his shoulder dislocate, and experienced extreme pain. *Id.* ¶¶ 22-23. X-rays taken at OSP's medical facility and later at Salem Hospital revealed that the surgical screw in Munoz's shoulder was damaged and that Munoz needed additional surgeries to correct that injury. *Id.* ¶ 23.

Along with his damaged shoulder, Munoz suffers from a tear to his anterior cruciate ligament ("ACL") and a meniscal tear. *Id.* ¶ 28. According to Munoz, his ACL tear needs to be addressed surgically. *Id.* The Therapeutic Level of Care committee ("TLC"), which Munoz alleges that Defendants use as an insurance approval and denial board, approved the ACL surgery. *Id.*

Munoz further alleges that every time that he gets close to having surgery, ODOC involuntarily transfers him to a new facility, and his appointments are lost. *Id.* ¶ 30. For example, in 2023, after returning to OSCI and complaining about his lack of medical care, ODOC transferred Munoz to Two Rivers Correctional Institute. *Id.* ¶ 31. As a result, he had to start anew with the facility's staff and wait for an orthopedic consultation. *Id.* Later that year, he received a letter from Dr. Roberts, the head doctor at ODOC, acknowledging the delay and informing Munoz that his surgery would be expedited. *Id.* ¶ 32. But rather than receiving treatment, Munoz was transferred back to OSCI and learned that the Salem orthopedic doctors with whom he had previously worked had closed their practice. *Id.* ¶ 34.

As of the filing of the Amended Complaint—nearly five years after the encounter with McKinney—Munoz has yet to have surgery for either his shoulder or ACL. *Id.* ¶ 29. Munoz

asserts that he struggles to perform his daily activities, his gait is abnormal, his knee and shoulder ache constantly, and his mental health suffers. *Id.* ¶ 35.

An internal ODOC report ("Report") was released in January 2025, revealing whistleblower allegations about ODOC's medical system. *See id.* ¶ 36. Defendant Bugher (the head of health services for ODOC during Munoz's incarceration) and Defendant Roberts both feature in the Report. *Id.*

The Report addresses Dr. Roberts' alleged mismanagement of ODOC's TLC. The Report states: "Roberts cancels TLC with no delegate, denying patient care"; "Roberts requires 'Level 1' care [the most prioritized care] to be approved by him or in TLC," when by Oregon administrative rule, Level 1 care can be authorized by "any treating provider"; "Roberts directs [TLC] but won't put his name in the patient's chart to avoid accountability"; "Roberts instituted a rule requiring all approvals for outside care to be brought back to TLC after six months, resulting in delays in care"; and "Even when care is approved, Roberts' management of out of facility trips has resulted in significant delays to care for serious patient conditions." *Id.* ¶ 40.

The Report also details Dr. Roberts' alleged mismanagement of out-of-facility trips, which are trips from an ODOC facility to visit an out-of-facility medical professional. "The audit faults Defendant Roberts for directly managing the westside out-of-facility transfers, and by refusing to approve out-of-facility transfers when implored by in-facility doctors." *Id.* ¶ 42. ODOC had only one out-of-facility trip coordinator, who Dr. Roberts would "pull away" from their coordinating duties. *Id.* ¶ 43. "[P]roviders and [medical service managers] were given direction that they could not call [redaction] to find out the status of a trip," *id.* ¶ 45, and "it was common for providers to question why [out-of-facility trips] had not been scheduled," *id.* ¶ 47. Although an "out-of-facility tracker existed, it was rarely updated." *Id.* ¶ 46. The Report detailed

PAGE 5 – OPINION AND ORDER

"numerous complaints and warnings" that were issued to Roberts, including a March 2023 report that showed that, at the Penitentiary, "only 6% of outside trips were scheduled within policy parameters." *Id.* ¶ 48. The Report concluded that "Bugher is aware of all of these concerns and has taken no action." *Id.* ¶ 40.

## DISCUSSION

Against Bugher, Munoz asserts a claim under 42 U.S.C. § 1983, alleging that Bugher violated his rights under the Eighth Amendment in concert with Roberts and others by being deliberately indifferent to Munoz's medical needs. Specifically, Munoz claims that Bugher is liable for "not transporting Plaintiff to see a competent doctor who can address his shoulder and knee problems, . . . not scheduling his knee and shoulder surgery for years, in transferring him to different facilities to avoid having his surgery scheduled, . . . not properly managing Plaintiff's pain, . . . failing to address gross deficiencies in the ODOC medical care system leading to the harms suffered by Plaintiff, and . . . not providing adequate physical therapy to him." ECF 41 ¶ 62. Bugher moves to dismiss Munoz's third claim for relief. ECF 59.

### A. Bugher's Capacity

Munoz has sued Bugher only in his official capacity. *See* ECF 41 ¶ 8. In moving to dismiss Munoz's amended complaint, however, Bugher argues as if Munoz had sued him in his *individual* capacity. *See, e.g.*, Bugher's Motion to Dismiss (ECF 59) at 5 (setting forth and arguing under a framework for "[s]tating a claim against a government official in his or her individual capacity" (quotation marks omitted)); *id.* at 8-10 (raising a qualified immunity defense[1]). Munoz responds to each of Bugher's individual capacity arguments on the merits.

---

[1] Officials sued in their official capacities are not entitled to a qualified immunity defense. *See Brandon v. Holt*, 469 U.S. 464, 472-73 (1985); *see also Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 965 (9th Cir. 2010) ("Qualified immunity, however, is a defense available

Neither party has raised the issue of capacity, and thus the Motion to Dismiss has been fully briefed as if Munoz sued Bugher in his individual capacity.

Whether Munoz sued Bugher in his official or individual capacity makes a material difference in this case. Munoz seeks only money damages from Bugher. *See* ECF 41 ¶ 71.[2] Claims for money damages made against state officials in their official capacities—just like those against States themselves—may be barred by the doctrine of state sovereign immunity under the Eleventh Amendment. *See Flint v. Dennison*, 488 F.3d 816, 824-25 (9th Cir. 2007). Further, only "persons" may be sued under § 1983. State officers sued in their official capacities for damages are not "persons" for purposes of the statute. *See Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 69 n.24 (1997) ("State officers in their official capacities, like States themselves, are not amenable to suit for damages under § 1983"); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Munoz's lawsuit against Bugher, to the extent that it is made against him in his official capacity, thus is improper.

Because Munoz does not bring this lawsuit *pro se*, the lenient standards for evaluating a self-represented plaintiff's complaint do not apply. That notwithstanding, the Court would grant Munoz leave to amend to cure this pleading deficiency. Little is gained from that formalistic exercise here, particularly because both parties have already briefed the issues as if Bugher was sued in his individual capacity. Accordingly, to preserve the parties' and judicial resources and promote judicial economy, the Court will evaluate whether, as alleged, Munoz's allegations would be sufficient to state a claim against Bugher in his individual capacity.

---

only to government officials sued in their individual capacities. It is *not* available to those sued only in their official capacities." (emphasis in original)).

[2] Munoz also asks that the Court "[g]rant such other relief as [it] deems just and equitable" but does not request any specific injunctive or declaratory relief.

PAGE 7 – OPINION AND ORDER

B.  **Eighth Amendment Claim**

Bugher argues that the Amended Complaint does not sufficiently allege supervisory liability. "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* "A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr*, 652 F.3d at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). Under either theory, "a plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury." *Id.* (citation omitted). "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207-08 (cleaned up). The Ninth Circuit has explained, however, that a court should not accept "wholly conclusory" allegations that supervisor reviewed and approved the plans of the supervisor's reports as supporting that the supervisor knew of resulting allegedly unconstitutional conduct. *Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir. 2012).

Munoz argues that Bugher "had knowledge of his subordinates' improper denial and delay of [Munoz's] medical care." *See* ECF 65 at 6 (citing Am. Compl. ¶ 40). This knowledge is based solely on the Report—there are no allegations about Bugher's actions or knowledge from any other source. Because there is no *respondeat superior* liability in § 1983 claims, Munoz must allege that Bugher's "own individual actions" violated his Constitutional rights. *See Iqbal*, 556

PAGE 8 – OPINION AND ORDER

U.S. at 676. Bugher's knowledge of, and acquiescence in, Roberts' mismanagement of ODOC medical care could qualify as an "individual action" sufficient to establish supervisory liability if there is a sufficient causal connection between that wrongful conduct (Bugher's knowledge of Roberts' mismanagement) and Munoz's alleged constitutional injury. *See Starr*, 652 F.3d at 1205-06, 1207. The allegations, however, are insufficient to establish that causal connection.

There is a dissonance between the well-pleaded factual allegations about Munoz's constitutional injury and Bugher's wrongful conduct—*i.e.*, the wrongdoing detailed in the Report that Bugher allegedly had knowledge of. Munoz alleges that he has suffered from "delay after delay in being provided appropriate medical care, pain management, and physical therapy for his injuries," and has been "suffering every day" because of his shoulder and knee injuries, which both need to be addressed surgically. Amended Complaint, ECF 41 ¶¶ 27-28. Specifically, Munoz alleges that his healthcare has been delayed because "[e]ach time [he] seemingly gets close to having surgery, he is transferred to a new facility against his will, and his appointments are lost." *Id.* ¶ 30; *see also id.* ¶¶ 31-34 (describing transfers to different facilities and impacts on surgery appointments). As alleged, the Report does not discuss any practice or custom by which AICs are transferred to different ODOC facilities such that their healthcare is improperly delayed.

The Report establishes that Bugher knew that Roberts mismanaged TLC—including by cancelling TLC with no delegate, requiring "Level 1" care to be approved by Roberts or TLC when it can be authorized by "any treating provider," and instituting a 6-month rule that required approved claims to return to the TLC, delaying otherwise approved healthcare. But Munoz's alleged constitutional injuries do not stem from those alleged misuses of TLC. Munoz does not allege, for example, that TLC was cancelled with no delegate such that his ACL or shoulder

surgery was delayed. In fact, Munoz alleges that TLC acknowledged his injuries and approved his ACL surgery. *Id.* ¶ 28.

Similarly, the Report concludes that Bugher knew that Roberts mismanaged out-of-facility transfers—that is, transfers from ODOC facilities to "out-of-facility medical professionals." *See id.* ¶ 37. Munoz alleges that Roberts sent him a letter acknowledging the delay with his ACL surgery and expedited the surgery in 2023. *Id.* ¶ 32. After that, Munoz alleges that he was "transferred back to OSCI, restarting the clock once more" and losing his surgery appointment. *Id.* ¶ 33.

Munoz has failed plausibly to allege that there is a "sufficient causal connection between [Bugher's] wrongful conduct and the constitutional violation" allegedly done by Roberts. *See Starr*, 652 F.3d at 1207. Munoz has not alleged that Bugher knew about the wrongful transfers from one ODOC facility to another that proximately caused Munoz's constitutional injury. *Id.* Because, as alleged, the Report does not discuss Roberts transferring AICs in a manner that wrongfully delays their healthcare, the Court cannot say that Bugher "knowingly refus[ed] to terminate" that practice, such that he should be personally liable under § 1983. *See id.*

Munoz argues, however, that it is reasonable to infer at the motion to dismiss stage that Bugher directed or ratified Roberts' actions, citing *NAACP of San Jose/Silicon Valley v. City of San Jose*, 562 F.Supp.3d 382, 398 (N.D. Cal. 2021), and *Martinez v. City of Santa Rosa*, 499 F.Supp.3d 748, 750 (N.D. Cal. 2020), in support. Both cases are inapplicable.

In *Martinez*, the court "presume[d] that the police chief was in control of his department" during the Black Lives Matter protests, which the court observed were "gripp[ing]" the city and "prompting the full attention of the police department." 499 F.Supp.3d at 750. In response to the protests, the department "execut[ed] an organized, department-wide response." *Id.* During that

PAGE 10 – OPINION AND ORDER

organized response, some officers fired tear gas into crowds of protestors. *Id.* at 749. The police chief then made "comments that could be interpreted as suggesting that the officers who used force did not meaningfully deviate from the department's plan." *Id.* at 750. With all that context, the court reasoned that it was "easier to infer that the repeated conduct of individual police officers is really the conduct of the department," such that the chief of police could be held individually liable for the conduct of the officers. *Id.* at 750. *NAACP* arises from the same factual background. *See* 562 F.Supp.3d at 389. There, the plaintiffs who were injured while protesting alleged that the supervisory defendants, higher-up officers, caused their constitutional violations by personally equipping line officers with highly dangerous impact munitions and approving their use in protest settings, declaring a curfew, and giving direct orders to the officers who caused the plaintiffs' injuries. *Id.* at 397. The court noted that "[a]ll of the plaintiffs in this case were either targeted with impact munitions or chemical agents," or "arrested under a challenged curfew order." *Id.* at 397-98. Therefore, it concluded that it was appropriate to infer at the pleading stage that the supervisory defendants either directed the impact munitions and curfew policies used during the protests or ratified the actions of their subordinates. *Id.* at 398.

There are meaningful factual differences in this case that make the ratification inference from *Martinez* and *NAACP* inappropriate here. As compared to the Black Lives Matter protests that called for a widescale organizational response from police departments, there is no reason to believe that Munoz's medical treatment was part of a unique or "organized" response on behalf of ODOC. Moreover, unlike the plaintiffs in *NAACP*, who alleged that the supervisory officers personally equipped lower officers with munitions and gave them orders that ultimately harmed the plaintiffs, Munoz does not allege that Bugher had any personal involvement in his treatment. And unlike the plaintiffs in *Martinez* who alleged that the police chief made statements ratifying

PAGE 11 – OPINION AND ORDER

the actions of his subordinate officers, Munoz does not allege that Bugher ever affirmatively ratified transferring AICs to different facilities in a manner that wrongly delays their healthcare.

Without the inference that Bugher ratified Roberts' behavior, Munoz is left with conclusory allegations about Bugher's knowledge that are insufficient to state a claim. *See Iqbal*, 556 U.S. at 676. Munoz alleges that Bugher is aware of all of the concerns in the Report and that Roberts' management of out-of-facility trips has resulted in significant delays to care for serious patient conditions. Munoz also alleges that the Report details stories similar to Munoz's of AICs waiting for months or years for out-of-facility medical care. However, the "mere delay of surgery" or medical treatment, "without more, is insufficient to state a claim of deliberate medical indifference." *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). Thus, this well-plead allegation against Bugher—that Bugher knew about delays in medical care—does not establish that Bugher acquiesced in unconstitutional treatment.

Finally, when "there is no allegation of a *specific* policy implemented by the Defendant[ ] or a *specific* event or events instigated by the Defendant[ ]," the Ninth Circuit has made clear that a complaint is too conclusory to state plausibly a claim. *See Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012) (emphasis in original). The only specific policies that Munoz alleges the existence of are insufficient to state a claim because, as alleged, they did not harm *Munoz*. The only specific events that Munoz alleges also do not state a claim against *Bugher*, because, as alleged, Munoz does not plausibly allege that Bugher knew about them.

The delay in Munoz's healthcare might constitute an Eighth Amendment violation. But at this stage, Munoz has failed plausibly to allege that Bugher has supervisory liability for that possible constitutional violation such that Bugher himself should be held personally liable. The

Amended Complaint, as written, seeks to hold Bugher liable only under a theory of *respondeat superior*. Thus, dismissal of the § 1983 claim as to Bugher is warranted.

Although Bugher requests dismissal with prejudice, the Court finds that dismissal with leave to amend is appropriate.[3] Munoz alleges that he has suffered for five years without two medically necessary surgeries, and that Bugher knew about various systemic problems within the ODOC medical system that likely contributed to those delays. Given the strong public policy in favor of permitting amendment, *Bowles v. Reade*, 198 F.3d 752, 757 (9th Cir. 1999), and the mandate that "[t]he court should freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), it would be improper to curtail Munoz's opportunity to replead.

## CONCLUSION

The Court GRANTS Bugher's Motion to Dismiss (ECF 59) and dismisses the Third Claim for Relief of Plaintiff's Amended Complaint (ECF 41) as to Defendant Bugher, with leave to amend. Plaintiff may file an amended complaint within 30 days from the date of this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 14th day of November, 2025.

>   */s/ Michael H. Simon*
>   Michael H. Simon
>   United States District Judge

---

[3] The Court recognizes that Bugher has also moved to dismiss on qualified immunity grounds. "'[Q]ualified immunity is immunity from suit,'" and "officials are entitled to an early determination whether they must proceed to trial." *Carley v. Aranas*, 103 F.4th 653, 659 (9th Cir. 2024) (quoting *Andrews v. City of Henderson*, 35 F.4th 710, 715 (9th Cir. 2022)). Without knowing whether Munoz can plead more specific factual allegations establishing Bugher's personal involvement in his injuries, however, it is impossible for the Court to reach a conclusion as to whether Bugher's "conduct violated a constitutional right." *Id.* (quoting *Hines v. Youseff*, 914 F.3d 1218, 1227 (9th Cir. 2019)).